We'll hear argument in our final matter of the morning, Boland v. Bonta, Case 23-55276. And this sort of goes without saying, but because we've been hearing argument in a similar matter earlier, let's try to pick up where we left off, and we'll see, encourage the Council to make new points as well that haven't been raised previously. Please go ahead. Sure. Good morning, Your Honor. As a formality, Charlie Taurosi on behalf of the California Attorney General. I'll start, again, there were questions about the five new models that have been made available for retail sale. Those five models were existing models that were off the roster that the manufacturers incorporated a chamber load indicator and or magazine disconnect mechanism into. And I think three of those five have ambidextrous features that plaintiffs have talked about. And so it's clear that these features can be, the chamber load indicator, magazine disconnect mechanism, are features that can be incorporated into semi-automatic pistols, and that manufacturers have simply chosen not to do so as a standard practice. And by doing so, they're trying to dictate what safety features the state or any state can require or not require. Going, I think, to the historical analysis points that were discussed in the... Just to tell you what would be useful for me is, you're the history place, but get back at some point to how you think the Prong-1 operates, because there was some discussion about that. The plaintiff's position is, essentially, if there's, as I understand it, if there is a gun you can't buy, that is a infringement within the meaning of the text. And I'd like to hear your position, but go ahead and do the history piece first. I'm happy to do the plain text, just for logical order, that's totally fine. So, for the plain text analysis, I think, consistent with Bruin, and consistent with this Court's decision in June in United States v. Alanez, the common use point is only one part of the analysis. It goes to what is an arm. Plaintiffs also have the burden of showing that the proposed course of conduct falls within the plain text of the Second Amendment, and so here plaintiffs had to show that the Second Amendment guarantees commercial access to semi-automatic pistols or a subset of handguns without public safety features, and plaintiffs did not show that. I mean, isn't the argument they have a presumptive right to purchase firearms that are in common use, which these are? Again, that is their argument, but common use, again, goes to what is an arm, and I think if you just rely on common use, that's conflating the arms question with the proposed course of conduct question. It doesn't matter what the variability is between what's the differences between what's in common use and what isn't. In other words, does the right to bear arms include the level of nuance and differences between guns that they're claiming? I mean, I want to, you know, most guns are green, so I want a green gun. So I think as Teixeira said, the Second Amendment does not elevate preference and convenience above all other considerations, and so I think the fact that they want to purchase a specific gun without public safety features is something that we would say that the plain text does not guarantee. By that logic, shouldn't Teeter have come out the other way? So Teeter looked at common use as one part of the question. It also looked at the proposed conduct, and Teeter was an absolute ban on possession and sale of butterfly knives, and this is not by any means an absolute. We would submit this on a ban at all, but even if you were to accept plaintiff's position that it's a ban on off-roster pistols, it is not an absolute ban because there are still revolvers available and the hundreds of semi-automatic pistols that are on the roster. But also that was a whole type of weapon. I mean, apparently it's distinct. I gather it has been distinct for many years. These are all, as I understand it, minor variations within semi-automatic pistols. That's basically what we're dealing with, right? Yes, Your Honor, I think so. There are variables, but no one's banning semi-automatic pistols or even semi-automatic pistols with certain generic features. They're not even saying anything about the existing features. Correct. It's just a condition of commercial sale, and so long as manufacturers meet those requirements, then those semi-automatic pistols can be available for retail sale, as has been shown or seen with the five new, so far, five new pistols that have been made available for retail sale with a chamber-load indicator and or a magazine disconnect mechanism. Okay. You want to talk about history? Yes. So I guess to start at the top point, which is that accidental discharge is not a new problem and has been around since the time of the founding. Our point is more specific to the weapon here, which is semi-automatic pistols, which were not invented until the early 1900s, were not introduced into the civilian market until, I think, around the time of World War II. And the way a semi-automatic pistol works, where it is not immediately obvious how many rounds you have, whether there is a round in the chamber, is completely different from the way that muskets and pistols worked around the time of the founding, where you would manually load your weapon and the weapons could not. I mean, the practice, as we, I think, showed in our historical experts' declaration, the practice was that those weapons were not kept loaded because gunpowder was so corrosive. And so for us, the change, the dramatic technological change, is the development of semi-automatic pistols and the risk of accidental discharge specific to those weapons. And I think the overarching argument that plaintiffs make that we have not identified an analog that imposes or acquires mechanical features is akin to demanding a historical twin, which we know Bruin does not require. We've shown that the burdens are comparable. We've shown that the justifications are comparable. And just the simple fact that... As to the proofing and also as to the gunpowder restrictions. Yes, Your Honor, for the gunpowder restrictions, gunpowder was an extremely corrosive item. It would absorb moisture and could easily detonate accidentally when exposed to heat. And so the restrictions such as the ones that Massachusetts adopted and the other inspection gunpowder, or I'm sorry, gunpowder storage. There were many, many gunpowder restrictions. There were many gunpowder storage restrictions, and those were intended to ensure that the gunpowder didn't unintentionally or prematurely explode, similar to how chamber load indicators and magazine disconnect mechanisms help to prevent the semi-automatic pistols from firing when the user does not expect them to fire because the user thinks it's unloaded. Why don't you walk through your argument on the nature of the burden, the comparative burdens from the historical analogs as compared to these and why you think it's analogous. So I think for the proving laws, the burden there was it had to inspect. They had to inspect every firearm that went to market. Here for the chamber load indicator, magazine disconnect mechanism requirements, and also microstamping. Once a couple models are tested and passed, and is added to the roster, that model can then just be sold. Not every firearm sold commercially then needs to be inspected. So I think the burden there is completely different, and the burden of the proving laws was actually greater than the burden here. As to the gunpowder storage laws, Heller tells us that those laws did not burden the right of self-defense, and I think this is where Pena comes in, where it did the severity of the burden analysis, which is relevant and still I think when you're evaluating comparable burdens, that is relevant. What Pena did is relevant to that analysis, and Pena said that these requirements impose almost no burden on the physical exercise of the Second Amendment right. The gunpowder restrictions pose a substantial burden, as I understand it, because if the gunpowder is over there, then you don't have it with you in your house over here, or it's in a certain place. In other words, if you want to use the gunpowder, you have to go get the gunpowder. Right. So the burden for the gunpowder, I'd say it's comparable, or the burden from the gunpowder storage laws were at least comparable to the burdens here. Well, they're much greater. Or more, I was going to say, or greater. Heller discounted the burden of those laws, but that was when it was comparing it to an absolute ban on the possession of handguns, which again is not what we have here. The Unsafe Handgun Act has nothing to do with possession. Well, I mean, it somewhat does. If you can't buy them, you can't possess them. Correct, but it does not restrict possession of officer guns. But, yes, I see your point that once you need to buy them. It's an odd feature. I mean, both sides seem to take advantage of this or argue it in their favor that you nonetheless, despite these not being approved on the roster, you can still get them in California by buying them through a private transaction or through some other means like that. You just can't get it from a retailer. That's correct, Your Honor, and I think that's similar to a lot of consumer product safety regulations where the primary commercial market is regulated, but the secondary market allows for exceptions. I mean, does it undermine the state's interest here that these are being allowed to be purchased through other means, that law enforcement can have them, and all these other things we're told about the exceptions? So I think law enforcement exceptions are common in firearm laws, and the law enforcement exceptions are not, I think, relevant to the Second Amendment analysis. In Pena, they raise an equal protection claim based on the law enforcement exceptions, and that claim was rejected in large part because law enforcement officers have far more training in firearms handling and storage than does the average civilian. And so I don't think the law enforcement exceptions carry the weight that plaintiffs think they carry here. And getting back to the historical inquiry, I think there was also an argument in the prior case that we think that the analogs we put forward are more than sufficient to show a historical tradition of regulating firearms to prevent accidental discharges or to prevent defective firearms. But there was an argument that there was too much silence by other states or we don't have enough analogs. And so I think the plaintiff in Rhena was getting to what is an outlier, and Bruin doesn't really specifically say what is an outlier. It, I think, sets forth maybe a few factors, but I think the primary one... Well, the outlier discussion in Bruin is about historical analogs. It's not about the regulations itself being an outlier, is it? Right. I'm sorry. I was in the context of the historical inquiry, and I apologize I am jumping around, but that is correct. And I can talk about why California is also not an outlier for the modern regulation, but as to the historical regulations, I think the primary concern in Bruin was whether there was contradictory evidence across time periods or jurisdictions, and that's simply there is no contradictory evidence, and I think... Well, there's a big discussion in the briefs about how, whether Massachusetts, on the proof statutes, whether Massachusetts really was a major gun manufacturer and whether one, I guess, two states is enough. I guess there were two states that had this proof thing. Is that right? So Massachusetts and Maine had the firearm proving laws, and then there were five states that had the gunpowder inspection laws, including Massachusetts. I thought there were more. I thought there were many, many gunpowder restrictions. There were inspection laws, and then there were storage laws, and then there was even one state or a couple that had rules about not having guns loaded with gunpowder, even in your house and so on. Correct, Your Honor. The five gunpowder I mentioned were just the inspection laws where they would, similar to the proving of firearms, they would inspect the gunpowder to ensure it met certain quality standards. There were also several gunpowder storage laws that we cited in our briefs, and there were also, I think, pre-founding, I think we cited three colonies where they had purchase orders for weapons that required the proving of firearms as well. And so I think the fact that other legislatures did not impose similar requirements in and of itself is not dispositive, particularly here when there is no contradictory evidence across the time periods or the jurisdictions. You raised an issue that I was going to ask about, which was the outlier point. Is California an outlier on this today in terms of imposing these restrictions, and if so, in your view, does it matter? The short answer is no, that California is not an outlier. So firearms are outside the federal jurisdiction of the Consumer Product Safety Commission, and so consistent with McDonald, states have devised social solutions and come up with reasonable firearm regulations, and California has done that here to ensure that the firearms that are commercially sold are not defective and do not, to the best extent, do not accidentally discharge. How many other states have the CLI and MDM requirements? So Massachusetts has a requirement that it has a chamber load indicator or a magazine disconnect mechanism. Massachusetts and Maryland have handgun rosters, as does Washington, D.C. Handgun what? I'm sorry. Handgun rosters. So like California has the roster, Maryland and Massachusetts and Washington, D.C. also have rosters. As I mentioned earlier, New York and New Jersey also have micro-stamping requirements. I think New York and Massachusetts also have. Well, they don't have micro-stamping requirements. Well, they have micro-stamping requirements. They have attempts to just determine whether they're going to have micro-stamping requirements. Correct. I would say they're not in effect. They're not in effect yet. But does any state have both CLI and MDM requirements besides California? No. California is the only one that requires both. But there are other states, like I said, that have drop safety and firing test requirements, and five states have melting point tests. And I think the fact that states are taking different approaches in this regard, I don't think it means that just because California has taken this approach, it means it's unconstitutional. Do you know whether there are other safety regulations being contemplated or possible, in terms of this kind of rule about how existing guns have to be made safer? Are there other examples? I think New Jersey has something called a smart gun roster that has also not really gone into effect and basically the way I think it operates is that once a smart gun, which is, I think, defined as a gun where it only fires based on your palm print or your thumb print, once a smart gun goes to the New Jersey roster, then every dealer in New Jersey has to carry one, quote-unquote, smart gun. So I see I'm very low on time, so I'd like to reserve the remainder of my time, if that's okay. Thank you. Thank you. Good morning, Ms. Murphy. Good morning, Your Honors, and may it please the Court. Erin Murphy on behalf of the plaintiffs. For the past decade, California has deemed handguns too unsafe to be sold to law-abiding citizens if they lack features that literally no handgun presently has. As a result, California's commercial handgun market has effectively been frozen. Many handguns or some handguns do have the chamber designator and the magazine. That's correct, but by California's terms, those handguns are still unsafe because they do not have micro-stamping, which is a necessary qualification under California law to deem a firearm safe. So by California's terms, literally every firearm, every handgun on the market is unsafe, and the ones that have come onto the market in the past 10 years are too unsafe to be sold to law-abiding citizens, to ordinary law-abiding citizens. They, meanwhile, are perfectly safe, apparently, to be sold to California. I think it would be better if you concentrate on the chamber designator and the magazine disconnect because the other has very different issues, and lumping them all together does not help the analysis a lot. Absolutely, Your Honor. We actually think they require a different analysis because the state's justification for them is different, but I'm happy to start by saying— Right, so to come up here and tell us that there are none, but that's not— they're not none with regard to the other two. That's correct, but just to start with, where the analysis should start here is the plain text question, whether what we have asserted here implicates the Second Amendment. So to start there, we think that the district court was absolutely right to say that that's really not a closed question. Bruin instructs that the way to analyze that plain text question is simply to look at the conduct in which the individual wants to engage, and the conduct we want to engage in here is simply acquiring handguns, acquiring handguns that there's no dispute are common handguns, no argument here that these are unconstitutional, dangerous and unusual arms or something that otherwise takes them outside of the scope of the Second Amendment. These are just common arms. So is your position that the right to bear arms is infringed if you can't buy any nuanced new version of a handgun that may be created? Is that the problem? Our contention is that that conduct is presumptively protected at the first— No matter what the nuance is, no matter how much difference it makes, no matter how much—what the reason is that—what the problem is with the requirement and how it would burden your right to bear arms. Trust your right to buy a handgun that's on the market because it's on the market. Presumptively. Presumptively at the textual threshold, yes. The how and the why and the burden and all of that is absolutely going to matter once you start asking whether the state has a justification for restricting the ability to purchase a handgun. But the justification, as I understand it, under Bruin, would then be kicked all over to the history provision? Correct. The how and the why is what matters at the historical analysis. You examine the how and the why of the minor— No matter how minor the differences between the guns or no matter how little the restriction, the regulation affects your use of the gun and makes no difference at all. If the state wants to restrict your ability to, in some sense, acquire the handgun, absolutely. And I don't think that's all that radical of a proposition. I mean, if the state wants to put like a one-cent tax on buying books, we don't say, well, you know what, that's negligible, so it doesn't even implicate the First Amendment. I mean, it's a state restriction on presumptively constitutionally protected conduct. And whether it's a minimal restriction, sure. That's going to matter when you start looking at the how and the why and comparing it to historical laws. But the threshold question is simply designed to basically ask, are you restricting the right to keep and bear arms? And if the state passes a law that says we're going to take a bunch of arms and say you can't buy them, I mean, it would seem sort of extraordinary to me to think that that wouldn't even implicate the Second Amendment at all. Just to understand what's doing the work here in this. So, you know, if California were to impose a design rule that ended up excluding one model of semi-automatic pistol, but you could get the other 999, is that the same case as this one? At the threshold, at the textual inquiry. How about on the back end? On the back end, you know, all of that's going to shift to history. I think it matters. You are, because Bruin says you look at the how and the why, and the how basically means you look at the degree of the burden as compared to historical laws. And it might be a very different case if you could demonstrate, you know, that the degree of the burden was such that almost nothing at all is kept off the market. But if you couldn't find historical analogs and the situation was, as Judge Bress suggested, that's it, the restriction's no good. You couldn't find an analog because the problem is or it's an innovation that simply didn't exist. So Bruin addresses that by saying there's a more nuanced analysis for historical analogs when you're dealing with technology that didn't exist at the time of the founding. So it doesn't mean, you know, just the smart guns, for example. Sure. As described, it's not going to restrict anybody from buying a gun. It's just going to assure availability. But if somebody developed some gun that was easy to produce and that just would never was like a self-driving car or was a self-shooting gun that knew exactly, you know, how to shoot and when not to shoot and so on, there'd be no historical analog, and that's it. You couldn't specify it. No, I don't think that's the right way to think about it because you just have to do, if you're dealing with brand-new technology, you know, smart guns, I don't think that you, I wouldn't stand here and say, oh, there's no laws about smart guns, so we win. You do historical analysis at a higher level of generality when you have new technology. But the question you'd start asking is, okay, how does a smart gun feature actually impact the right? And while it may sound good in theory, a lot of people think it's a problem to have a gun that nobody can fire if their biometrics aren't attached to it because it means maybe other family members or somebody who needs that in that life self-defense situation might not be able to fire it. So you have to then analyze, yeah, it's new technology, but how does it impact it? And I think that's exactly what the state kind of wants to elide here. Take something like the magazine disconnect mechanism. The state wants to just call that a safety feature. It's actually a feature that alters the operation of a handgun. It means that somebody who wants to fire the round in the chamber cannot do so. Many people, including law enforcement all throughout California, they want firearms that can fire the round in the chamber in the event you have a problem with the magazine, if the magazine comes out or whatever it may be. So this is an argument that the magazine disconnect mechanism actually has an impact on self-defense. Does that argument apply for the CLI? We did submit testimony below about how the CLI actually has some functional impediments. That is part of the reason people, and it's partly owing to the fact that California has a particularly demanding conception of a CLI because while there are some firearms on the market that have something that functions as a loaded chamber indicator, California requires it to be visible and have language or pictures or something, and it typically ends up being a bit of a distraction from the site, which is part of why a lot of people don't want the kind of chamber load indicator that California is mandating. So it's less, I think, of an interference than a firearm that actually won't fire when you pull the trigger and there's a loaded round of ammunition in it. But it does have functional impacts on a firearm that probably explain why California's particular variant of CLI has not become common anywhere in the marketplace. People just don't want to pay for a feature that also is not something the average firearm owner is going to rely upon since the first rule of firearm safety is it's your responsibility to ensure, regardless of whether there's a CLI on it, whether your firearm is loaded. Right. I guess what I'm trying to understand is there's talk at a high level about design requirements, and I'm trying to understand are there differences within that broader category in terms of requirements that affect the right to self-defense and those that may not. Yeah, and I think there are historic... of the proving laws and why they're so different from what we're talking about here. Tell me why that is. Because proving laws were about ensuring that a firearm wasn't defective, that it did what it was supposed to do when you pulled the trigger. But I thought that there were specifications. There were specifications that they were designed to enhance the qualities of the firearm, not to, you know, minimize them. They were, you can't have a firearm that doesn't at least do this much. We want to make them, we want to ensure that they have a high quality, not... I mean, because if somebody wants to buy a firearm that doesn't do that but does something else, why can't they? And there just is no indication historically that anybody wanted firearms that didn't at least fire when you pulled the trigger and fire a certain distance. I mean, basically the laws took what was the industry standard of what everybody wanted in a firearm and said, okay, you've got to have at least that. But if they said... I find that difference fairly ephemeral, because it was being portrayed as if there were no standards, but there were standards. I mean, I take the point that there were standards, but ultimately what you were doing was ensuring that the firearm did what the person purchasing it was promised it would do, which is fire when you pulled the trigger. The main thing was to ensure... If some person had showed up in 1810 and said, well, I'm sorry, but I would rather have a gun that is improved and it'll be cheaper, I'd rather have a cheaper gun. I wouldn't take my chances. Under your theory at the first hand, does he have a right to do that? At the textual threshold, textual inquiry, you know, talking about an arm. But I think that would be... I mean, just to put it in more concrete terms, I think this would be a much harder case if we were in here challenging the drop safety requirement. Because if we were in here challenging the drop safety requirement and saying, you know, we want to purchase firearms that when you drop them indiscriminately fire anywhere... But suppose at the time that those... And it's probably true that at the time that those rules were put into effect, most guns do not have that protection. And somebody says, well, the generally available guns don't have it. I have a right to buy the guns that exist. Sure. And I think, like, just take historically. If proving laws had instead said... But you would still say at the front end that that person had... At the front end, yes. That was under protection. So then you'd have to get to the history part and you'd have to find some analog to a dropped gun. Yeah, and I think it would be much easier for the state to argue that a drop safety requirement is more akin to the proving laws. It's ensuring that just as part of the proving test was ensuring that the firearm wouldn't, like, explode when you pulled the trigger instead of firing or just completely malfunction, it's ensuring that the firearm won't do something you don't want and expect it to do. And I'm talking here about, you know, not because you're under a misconception about whether it's loaded, but people generally don't want their firearm to just go off when they inadvertently drop it. That's considered by most people to be a defective thing you don't want in your firearm. And so I think that's why the state, if we were talking about... If we were here really challenging that, which I don't think it's surprising that you haven't seen a bunch of people challenging drop safety testing, the state would have a better argument about that being more akin to the old proving laws because it's really about whether ensuring that a firearm isn't defective and meets the consumer's expectations. But what makes this law completely different is this is saying, no, no, no, we don't care about the consumer's expectations, even if the consumer doesn't want their firearm to not be able to fire the round that's in the chamber or finds a CLI to be a distraction that might be problematic when they're trying to fire it. You know, we don't care what the consumer wants. We're mandating that you purchase a firearm that has those characteristics anyway. That's what the state hasn't shown any historical... I understand your argument. What about the gunpowder restrictions of various kinds? Sure. I mean, I think the first fundamental problem the state has is a completely different why. Those were laws about gunpowder being just flammable in and of itself. It's a dangerous explosive. Yes, it was a different danger because it was a danger that dealt with the technology at the time, and this is a parallel danger but a different one that deals with the technology at this time. But in terms of burden, I think you'd have to agree that the burden of the gunpowder restrictions was much greater. I mean, not necessarily. It depends what you're talking about. A lot of them were simply about how you stored your excess gunpowder, that it had to be in four canisters instead of one. That's not a restriction on your ability to use the gunpowder when you want to fire the fire. But you have to go get it. You have to go get it, but I mean, they're really about the storage, not... So in terms of delays... Most of... There's obviously... If you can't store the gunpowder in the gun, and apparently you, in many instances, you couldn't store it sometimes even in a different building or in a different room and so on. With respect, most of the laws were not addressing what you could do vis-a-vis the gun. They were talking about your excess gunpowder when you're not using it with your firearm, if you kept extra around your house, or there are zoning laws for gunpowder manufacturers and such. But I assume you're always keeping extra around your house. And my understanding is you can't leave the gunpowder in the gun because... There were very few laws that actually said that you couldn't do that. But I think if you actually can't, it won't work. So you have to have the gunpowder somewhere other than in the gun. And if it has to be, you know, in a different room or off-site or in the basement, obviously that's going to take... It seems clear that the burden is greater. I mean, I just think it's pretty hard to accept that when Heller considered those exact same laws and said that they just were not analogous to restrictions on the ability to have the gun in the first place. And this is a restriction on the ability to have the gun in the first place. So, you know, if they're not good enough there... Oh, it's a restriction on the ability to have a gun without the chamber indicator. Correct. But either way, it's a restriction on the ability to have the gun at all. And Heller basically said, look... Well, first of all, it's not a restriction on having the gun. It is in the sense that it's restricting my ability to get the gun, which is inherently a restriction on my ability to have the gun. And I don't take the exceptions in this law to exist because California really wants its citizens to go, you know, buy a bunch of these purportedly unsafe handguns on the secondary market. I mean, the ultimate goal of this law is to phase out the firearms that are possessed by law-abiding citizens in 49 other states in this country and have a completely different market in California that mandates features that aren't common. Can I ask you a question about technology? Because, you know, technology changes over time. So today, this is not a common law. But we can't predict the future. In 10 years, what happens if half the states decide, you know, that's a good idea to have a CLI and MDM requirement? Does the analysis then change? I think, you know, I don't think, like, at the end of the day, everything turns on how many states accept it. I think the more important question is how prevalent the technology is. And if the technology becomes prevalent in a way where, you know, it's just really easy for people to get them, I mean, some of the laws that the less extreme approaches that California hasn't taken where you might say, look, you got to, if you have technology that's possible, kind of sell one with it, sell one without it. People still have a choice. But if you're mandating in a way where it's something the market is generally not producing, I think that's a real problem. So the market is then becoming, and that's not the way consumer regulation usually operates. I mean, airbags are one example. Electric cars are another. The government decides that something has to happen for public safety reasons or climate change reason, and it gives people time. I mean, you can quarrel with the timing, particularly on the micro-stamping, but if it's phased in, if the manufacturers are given the opportunity to comply over time, eventually they comply. And if everything is market-driven, it's very hard to understand why the Second Amendment makes the market the determinant of the scope of the right to bear arms. Well, I mean, the first thing I would say is I'm not aware of any consumer product safety law under which the government says this is unsafe but the government can use it. That's not typically what happens when you actually think a product is unsafe. So it's a little hard to understand this as a true consumer safety product law when they're saying everybody is a state of California. Which is that the people who can use it are people who spent 600 hours in gun safety classes before they used it. We're not talking about, you know, like complex means of how you use a firearm. It's simply a question of checking whether your firearm is loaded, which is the first rule of gun safety taught in every class in the country. Yes, but there are children and there are people who are not... Sure, but generally... It's not that it doesn't happen. It happens fairly frequently. Generally, consumer product safety laws the concept is this is a product that is not fit for people to have. And there's an awful lot of people... I mean, there's not even a possession restriction. There's an awful lot of people here that California allows this product to continue to be sold to. And that right there requires a historical justification. And the state hasn't pointed to any historical law that's ever said certain types of firearms... I mean, check airbags. That's not a determination the car isn't safe to drive. It's a determination that it will be safer if it has airbags. And again, we're in the realm of the Second Amendment where the Supreme Court has said... Well, I know, but that's a back out. We've got it constitutionally protected. I understand that, but that's... I was talking about the question of whether the market runs everything. Sure, and I think... And why the Second Amendment should incorporate the notion that the market runs everything is something I don't get. Because the Supreme Court has... The historical test for whether an arm is protected is whether it's in common use. And that is a test that asks is this something that the people choose? And that makes some historical sense when you're thinking about the point of this was an amendment that protects the ability to possess something and protects you against the government taking it away. It would seem awfully problematic if the government gets to decide at the front end which things you can and can't possess. So if over time, if in 10 years, consumers have a different perspective, they decide, no, these are actually features that we want. And it turns out manufacturers cater to that and start to produce more of those. And the amount of pistols that are on the market that don't have these features turns out to be the minority. Does the analysis at that point change for people like your clients? So I think... To take the two pieces historically of the how and the why, we're still going to have the same debate about the why. But assuming there were analogous why laws, the burden on the how could be different at a different point in time. I mean, that's part of why this would be a different case if we were here challenging safeties. It's a little bit different. I'm sorry, I didn't hear what you're saying. If we were challenging safeties, I mean, it does matter under Bruin. You're judging, you do look at the degree of the burden. Now, unlike... Your point being safeties are just common and everywhere at this point. We don't have a record here about it, but I think it would be a different case and there may be stronger arguments about the degree of the burden and how that burden is comparable or not historically. I mean, yes, Bruin changed the analysis in the sense that you have to look at the degree of the burden as compared historically, but you still do look at the degree of the burden and that may be different today versus 10 years down the road versus 50 years down the road. I did want to get your perspective. The state was emphasizing the number of pistols that have been added to the roster more recently. They have the CLI and the MDM, both the 32 plus the more recent ones. What is your position on the relevance of that? I don't really think it matters because the ultimate question is here is whether we have a constitutional right to purchase the pistols that aren't on the roster and I don't think that that really changes the bottom line about what whether we do. That said, I mean, I will note as the district court found after considering a record here about lots of things, including lots of testimony about feasibility, but the district court found that those numbers are pretty inflated because of the way this law works such that it double counts things if they come in a different color and such. So the number of available truly different models, even among the now I guess it's 37, is pretty overstated just as the number of the 300 or so on the roster is itself overstated for exactly the same reason. I see my time is up. Do you want to briefly address, we've been keeping you away from the micro stamping, but I asked in the last argument if we thought on this record that we basically had no useful information about the feasibility question, which meaning I gather we do know that it's technologically feasible, but there is some notion that it's not commercially feasible because each manufacturer has to figure it out for himself, figure out how to apply it to their particular guns. And as I noted, the person who testified in this case was not qualified as an expert and didn't seem to have, there's nothing to suggest that he had any information since 2005. So if you want to comment upon that, that's good. That's fine. Sure. I would actually very much resist that characterization of the record. He was specifically asked, has there been technological developments since 2005 and discussed this in his testimony. But there was no evidence that he knew anything. Did he ever see the guns since, one of these guns since then? That's not, I don't think that's a fair characterization of his testimony. He's worked in this area and he talked about his knowledge that there hadn't been any developments. We also had testimony from somebody from NSSF, the manufacturer trade industry, that talked about how this, why this hasn't been commercially feasible. And what he explained, what Mr. Beto explained, is it's feasible in the abstract sense, but in order to satisfy California law, for one thing, it has to pass the test like hundreds of times. And it may be feasible that you can do it a few times, but it's not feasible. I thought that his 2005 study showed that hundreds of times, many of the guns work 95% of the time or 90% of the time. There's been some of the guns for which it has worked and others for which it hasn't. The other impediments are, it's not just that there's lots of different firearms. You can use different ammunition with different firearms and the different ammunition can have an impact. So you have to be able to develop it to work. My ultimate question is, if we thought we were at zero, if we thought that there was no useful information, because the state didn't put on anything, really, except its legislative findings, how conceptually does that matter? I think to the extent feasibility matters, that means the state loses because it's unquestionably the state's burden to prove that this is consistent with historical tradition, that it's not imposing a greater burden than historical laws. They declined to put on any evidence about the degree of burden that this is actually imposing, so I think they lose. That said, there was a two-day evidentiary hearing here. The district court made a factual finding. That is a factual finding based on testimony that is subject to clear error review. Well, I know, and I'm assuming, for present purposes, I'm assuming that there was arguably clear error because there is not much evidence of what he said he found. And I would just encourage you to go... But leaving that aside, let's, assuming that, I want to know what the conceptual... I understand your answer now. Yeah, and my answer is if they didn't put on any evidence, you know, even if you didn't think our evidence is sufficient, it's their burden, not ours, given that this is a law that implicates constitutionally protected evidence. Because you think everything is shifted to the history side, so... Correct. If we're on the other side, where would the burden be, if we're on the prong one? I mean, you know, at that point, I guess I would say if you think we have some sort of burden to prove that this is infeasible, I think we met it. I mean, we put on multiple witnesses who provided testimony that a district court heard a whole day of testimony about and decided they were credible and proven to him that this was not feasible on a commercial... But your witness was not... Every other one of the witnesses was specifically qualified as an expert. He was not. I'm not really sure why that makes a big difference. I mean, the state wants to rely on him as an expert when it comes to the question of whether it's feasible in their conception of feasibility, then turn around and say he doesn't know what he's talking about when it comes to whether it's feasible on a mass scale. I don't really think they can have it both ways. Okay. Thank you. I think we've let you go over your time, so I want to thank you, Ms. Murphy, for your argument this morning, and we'll hear rebuttal. Thank you. A few points, Your Honors. I believe I heard my colleague say that nobody wants a defective gun or a gun that's not subject to drop safety testing, but I think it's important to remember that in the Bolin case, the plaintiff's complaint actually challenges the entire Unsafe Handgun Act. They are challenging the drop safety test, the firing test, and the safety requirement. Is that correct? The complaint challenges every aspect of the Unsafe Handgun Act. Right, but the injunction that's before us doesn't enjoin the rest of it. It does not, but Renna, the plaintiff's son, sought to enjoin the entire Unsafe Handgun Act, and the district court did reject those arguments, but I think if you were to accept the plaintiff's view as to what the plaintiff's inquiry is, I think they are using that for those other features of the Unsafe Handgun Act, including the drop safety, firing test, and the safety device requirement. The safety device requirement. I'm not sure I'm following the point you're trying to make. I want to make sure I understand where you're going here. My point is that plaintiffs are saying that they don't want access. I think what I heard being said is that they don't want to buy defective pistols, but the fact that they're challenging those other three requirements as well I think is inconsistent with that statement. And I guess you're also making kind of a slippery slope argument. That is correct as well, Your Honor, yes. I mean, the safety device requirement, it's called a positive manually operated safety device. It also prevents accidental discharges. That is the point of it, is to ensure that the gun only fires when the trigger is pulled. And that is also the point of the drop safety test as well. And there is a lot of reliance, I think, on Bruin in saying that common use is sufficient in and of itself, but I think Justice Alito's concurrence in that case made clear that Bruin was saying nothing about which weapons were protected and which weapons are not protected. And so common use may be necessary for the plaintext inquiry, but it's certainly not sufficient in and of itself. And the historical arguments, I don't think I'm going to address them point by point. I'll just say overarching, I think the arguments here are still asking for a historical twin, even though I think I heard an acknowledgement that there are dramatic technological changes here. But regardless of which approach or which standard is being applied, I think Bruin made clear that a historical twin is not required. And I think there was also a suggestion that Heller wrote off wholesale gunpowder storage regulations. I don't think it wrote it off wholesale for historical analog. It was just saying it was not analogous for the regulation at issue in Heller. And I think for about Mr. Beto's testimony, he did test six different pistols from one manufacturer. He tested five pistols from five individual other manufacturers. He used different ammo. And I think our reliance on Mr. Beto is not a concession or acknowledgement that we think he is a qualified expert here. I think her point in pointing to Mr. Beto's study and his testimony is to show that there was clear factual error here and that the district court was simply unsupported in its factual findings. And one example is where the court said that Mr. Beto testified that something along the lines of half a quote is that commercial implementation was not possible. And he said it was not suitable for mass implementation at that time, which was 2005, so 18 years ago. And a lot has changed since Was there any indication that he had done any separate consideration since that time? Of the microstamping requirement? Not that I'm aware of, Your Honor. Well, he made a statement about the present but there was nothing to back it up about what had happened in the ensuing 18 years. I think his statement was that in the course of conduct  examiner, he had not seen a microstamp pistol come across his desk. He hadn't seen one, he hadn't tested one. Correct. What more is he supposed to say when there's an absence of development? He said, or he was basically asked are you aware of any developments and he said he's not aware of any. Correct, but he hasn't been involved he lives in Arizona, he was not familiar with some of the California requirements and at that time in 2005 when he studied microstamping, he said that the way California had developed the regulations related to microstamping where it uses alphanumeric characters that that method had the best possible chance for mass commercial implementation. He has not been involved in testing any microstamping since then. He's not been involved in any studies whatsoever since then. So I think our point about the Beto study is that it just simply does not support a conclusion by the government. Microstamping is forever not commercially feasible and I think again I guess that before any ruling on microstamping should be limited to what is in the record here rather than a broad statement about the feasibility and commercial availability of microstamping. Let me see if my colleagues have any further questions for you. I do not. I want to thank you for your argument this morning. I want to thank both council for the briefing and argument. This matter is submitted and this concludes our calendar for this morning. We'll stand in recess until tomorrow morning. Thank you both. All rise. Report for this session stands adjourned.
judges: BERZON, RAWLINSON, BRESS